**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FIGG BRIDGE ENGINEERS, INC.<br>424 N. Calhoun St.<br>Tallahassee, FL 32301,<br><br>and<br><br>WILLIAM PATE,<br>8021 Pickwick Court<br>Tallahassee, Florida  32309,<br><br>      Plaintiffs,<br><br>v.<br><br>FEDERAL HIGHWAY ADMINISTRATION<br>1200 New Jersey Ave., SE<br>Washington, D.C. 20590,<br><br>and<br><br>HARI KALLA, in his official capacity as the<br>Suspension and Debarment Official, Associate<br>Administrator for Infrastructure of the Federal<br>Highway Administration<br>1200 New Jersey Ave., SE<br>Washington, D.C. 20590,<br><br>      Defendants. | Civil Action No.<br><br>Judge |

---

## <u>COMPLAINT</u>

    Plaintiffs Figg Bridge Engineers, Inc. and William Pate bring this action against the Federal

Highway Administration and Hari Kalla, in his official capacity as the Suspension and Debarment

Official of the Federal Highway Administration, for violations of the Administrative Procedure

Act ("APA"), and allege as follows:

## INTRODUCTION

1.      This is an action under the Administrative Procedure Act challenging the Federal Highway Administration's ("FHWA" or the "Agency") recent suspension of Plaintiffs from participating in any federally-funded government program and/or contract.

2.      Specifically, on July 14, 2020, the FHWA issued a notice of suspension and proposal to debar Figg Bridge Engineers, Inc. ("Figg" or "the Company") and one of its engineers, William Pate, for their involvement in the Florida International University pedestrian bridge project ("FIU Bridge").

3.      On March 15, 2018, the FIU Bridge collapsed during project construction. Tragically, six people died as a result.

4.      Although Plaintiffs were two of a number of parties involved in the FIU Bridge project and not the party responsible for site safety, construction or inspection, Plaintiffs are the *only* parties that the FHWA has suspended and proposed to debar as a result of the accident.

5.      The FHWA's proposed action is a significant departure from the applicable regulatory guidance: by seeking a 10-year debarment of Plaintiffs, the FHWA seeks to impose more than three times the generally-imposed debarment term.  This sentence, in addition to the immediate suspension, will no doubt result in the complete and irreparable destruction of the Company – a female-owned family business that has been in existence for more than 40 years – and Mr. Pate's career.

6.      Significantly, the FHWA fails to make a *prima facie* case for suspension.  It offers only a single conclusory sentence purporting to justify the critical requirement that there be an "immediate need" to suspend Plaintiffs.  This requirement, of course, is an essential one: without

2

an "immediate need," there is no justification to impose the draconian sentence of an immediate suspension while the debarment process plays out.

7.      Underscoring the lack of any exigency, the FHWA did not suspend Plaintiffs until two and a half years after the March 2018 accident and nearly nine months after the last report on which the Agency bases its conclusions.  Nor does the Agency point to any specific immediate or upcoming project from which Plaintiffs should be prevented from participating, claiming instead that the immediate suspension is necessary because Plaintiffs "could" work on federally-funded projects at some unspecified point in the future.

8.      In addition, these actions are not based on the Agency's independent fact-finding. Instead, the Agency relies wholly on reports from other agencies released between nine and twelve months ago.  The processes that resulted in those reports either excluded or severely limited Figg's participation.   As set forth below, Figg has legitimately challenged those reports' central conclusions on the basis of sound engineering principles.

9.      The inexplicable delay in the FHWA's administrative action, the failure of the Agency to base its suspension on any "immediate need" to protect the public interest, the excessive length of the proposed debarment, and the disparate treatment of Plaintiffs from other parties with substantial involvement in the FIU Bridge project reflect that the FHWA is improperly using the suspension and debarment regime to blame this tragic construction accident on Plaintiffs and to punish Plaintiffs.

10.     The Agency's punitive suspension of Plaintiffs is arbitrary and capricious, not in accordance with the law and the Agency's own regulations, and must be vacated as a result.

## PARTIES

11.     Figg Bridge Engineers, Inc., is a female-owned, for-profit, nongovernmental engineering company, with its headquarters and principal place of business at 424 North Calhoun Street, Tallahassee, Florida 32301.

12.     William Denney Pate ("Pate") is a Senior Vice President / Principal Bridge Engineer at Figg Bridge Engineers, Inc., who resides at 8021 Pickwick Court, Tallahassee, Florida 32309.

13.     Defendant Federal Highway Administration is (and was at all relevant times) an agency within the United States Department of Transportation created in 1967, and is subject to review under the Administrative Procedure Act.  *See* 5 U.S.C. §§ 551(1).

14.     Defendant Hari Kalla is and at all relevant times was the FHWA Suspension and Debarment Official ("SDO") and is being sued in his official capacity as SDO, the FHWA agency official who issued the Suspension Decision, and in his official capacity as Associate Administrator for Infrastructure of Defendant FHWA.  Defendant Kalla is subject to suit pursuant to 5 U.S.C. §§ 702-703.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Administrative Procedure Act §§ 500 *et seq.*

16.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this is an action against an agency of the United States that resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL BACKGROUND

### The Florida International University Pedestrian Bridge

17.     On January 14, 2016, the Florida International University Board of Trustees entered into a design-build contract with prime contractor, Munilla Construction Management ("MCM"), to construct a pedestrian bridge that connected the university campus in Miami, Florida, with the City of Sweetwater.  The pedestrian bridge would cross over an eight-lane roadway, SW Eighth Street.

18.     On April 28, 2016, MCM entered into a subcontract with Figg to provide design and engineering services, including final design, construction drawings and specifications associated with the pedestrian bridge.  Mr. Pate, an employee of Figg, served as the designated Engineer of Record ("EOR").

19.     Figg has a 42-year history of excellence and specializes in the management of diverse engineering teams for major bridge transportation projects and in the design of major concrete bridges.  Figg's motto is "Creating Bridges as Art®" and it has designed some of the most iconic bridges in the United States.

20.     Figg and its related entities have received more than 420 design awards, three Presidential Awards through the National Endowment for the Arts, and many other accolades for their design and engineering work.  In fact, the FHWA has awarded Figg numerous awards for its design and engineering work and, as of the date of this filing, still touts the majesty and engineering feat of several Figg-designed bridges on its website.

21.     Per the terms of MCM's contract with FIU and Figg's subcontract with MCM, Figg was required to prepare plans and designs in accordance with American Association of State Highway and Transportation Officials ("AASHTO") Load and Resistance Factor Design Bridge Design Specifications, as well as a host of other design and engineering requirements.

22.     On September 16, 2016, Figg entered into a sub-subcontract with Louis Berger to conduct the required peer review of the bridge design.  The Florida Department of Transportation ("FDOT") website indicated that Louis Berger was qualified by the State for this type of peer review work.

23.     Per an independent third-party, Wiss, Janney, Elstner Associates, Inc., the primary parties involved with the FIU pedestrian bridge project were as follows:[1]

| Organization | Role |
|---|---|
| Florida International University (FIU) | Owner |
| Florida Department of Transportation  (FDOT) | Project oversight and administration |
| Bolton Perez and Associates, Inc.  (BPA) | Certified Engineering Inspector (CEI) for FIU |
| The Corradino Group (Corradino) | CEI Post-tensioning inspector for BPA |
| Munilla Construction Management, Inc. (MCM) | General contractor (design-build team leader) |
| The Structural Group of South Florida  (Structural) | Concrete subcontractor to MCM |
| Structural Technologies /VSL, LLC  (Structural/VSL) | Post-tensioning subcontractor to MCM |
| RC Group, LLC   (RC Group) | Formwork and scaffold subcontractor to MCM |
| Barnhart Crane & Rigging Company (Barnhart) | Precast bridge transporter to MCM |
| Georges Crane Service, Inc. (Georges) | Crane supplier to MCM |
| Cemex (Cemex) | Concrete supplier to MCM |
| FIGG Bridge Engineers, Inc. (FIGG) | Lead structural designer to MCM |
| The Louis Berger Group, Inc.  (Berger) | Independent peer review to FIGG |

24.     As is reflected in the chart above describing party roles, MCM, as the general contractor and the party with whom FIU directly contracted, bore primary responsibility for all phases of construction and site safety.

25.     The funding sources for the pedestrian bridge included federal, state and local agencies, as well as the FIU.  Among the federal contributors was the U.S. Department of Transportation's Federal Highway Administration.  FIU, with the support of FDOT, administered the project.

---

[1]     Bolton, Perez, and Associates, Inc.'s accurate listed role is **Construction** Engineering Inspector.

26.     A rendering of what the completed bridge is shown below.  As noted further below and depicted in a photograph taken on March 10, 2020, at the time of the collapse, the bridge was still in its construction phase as many aspects and features of the bridge had yet to be completed by the prime contractor.



27.     The concrete bridge was cast adjacent to the permanent bridge location and then transported to its final position spanning SW Eighth Street using what is known as Accelerated Bridge Construction ("ABC").  The ABC method, which is approved by and promoted by FHWA, provides for minimal traffic disruption, work-zone safety improvements and other benefits.[2]

28.     The main span was cast above ground level and supported by temporary falsework, which supported the weight of the bridge along its entire length.  Bolton Perez and Associates, Inc. ("BPA"), which FIU retained as the Construction Engineering Inspector, completed a truss crack inspection on February 6, 2018.  BPA noted minor cracks in several truss members, but no cracking or distress was reported at or near the connection of the concrete support beams or columns,

---

[2]       *See* https://www.fhwa.dot.gov/bridge/abc/.

referred to as Members 11 and 12 to the deck (Members 11 and 12 are the northernmost diagonal (#11) and vertical (#12) concrete elements connecting the bridge canopy to the bridge deck). Below is a diagram of the various members (1 through 12) and other key features of the proposed bridge.



29.     Falsework and shoring removal began on February 23, 2018.  As the falsework was sequentially removed from the middle of the span toward the ends of the span, the load was transferred through the main span structural load-carrying elements to the temporary end supports. This removal concluded on February 25, 2018.

30.     The first known indication of distress to the Member 11/12 region was documented in a crack report BPA prepared on February 28, 2018.  The observed crack occurred in the corner of Member 11 near the deck.

31.     On the morning of March 10, 2018, the main truss began to be moved to the final location.  At approximately 11:30 a.m., the truss was placed over its supports.  Soon thereafter, MCM, BPA (FIU's Construction Engineering Inspector), and Figg employees walked over the bridge and did not notice a change from before the move.

32.     Below is a photo of the main (south) span of the bridge on March 10, 2018, as it is being moved into its final position on the south pier and central pier:



**The Collapse of the FIU Bridge**

33.     As is common, each party in the building and inspection process for the bridge had a specific role as a matter of law.

34.     Importantly, under Florida Department of Transportation rules, EORs such as Figg are not permitted to serve as the Construction Engineering Inspector during construction of the bridge.

35.     Unlike MCM, which was required to be present on-site to supervise construction, Figg was not required (nor permitted per Florida law) to be on-site supervising the implementation of its designs.

36.     Moreover, Figg was not responsible for site safety or security and the decisions regarding street closure.

37.     On the afternoon of March 10, 2018, post-tensioning work was performed and substantial cracking was observed by the team performing the operation. Figg was not on site. Despite the cracking, the team on-site did not notify Figg and instead opened the road underneath

the bridge to traffic and demobilized the equipment that was used to move the span, which could have been used to again temporarily support the span.

38.     On March 12, 2018, at 4:51pm two days after the cracking was observed and the construction and inspection team had opened the road, MCM, which was on-site to perform construction, emailed Figg expressing concern about the cracks that appeared in the afternoon of March 10, 2018.

39.     On the morning March 13, 2018, MCM informed Figg in a phone call that the cracks were observed on March 10th before the post-tensioning operation, that they became slightly larger after the post-tensioning operation and had not grown in size since.

40.     On the afternoon of March 14, 2018, MCM sent additional photographs of the cracking to Figg without any commentary such as crack size or growth.

41.     However, no party promptly informed Figg of all cracking, how the cracks may have been growing, or provided crack measurement reports.

42.     On the morning of March 15, 2018, Figg employees, including Mr. Pate, came to the construction site to examine the cracks and present the results of analyses Figg performed in the previous two days based on the information provided to them by MCM.  Figg, FIU, MCM, FDOT and BPA met at approximately 9 a.m. local time to discuss the cracking and potential remedial measures.

43.     From the time the cracking was observed on March 10 through March 15, 2020 none of the parties responsible for potential emergency road closure (FIU, MCM, FDOT and BPA), many of which had extensive experience in bridge and concrete construction, took action to close down SW Eighth Street.

44.     On March 15, 2018, at approximately 1:45 PM, the main span collapsed as post-tensioning bars in the northernmost diagonal (Member 11) were being re-stressed.

45.     The collapse was triggered by failure of the connection between the Members 11 and 12 and the deck. A rendering of the connection point that failed is shown below:



46.      As a consequence of the collapse, six people died (one construction worker and five third parties driving under the bridge at the time) and ten people were injured.

### The OSHA Investigation and Report

47.     In light of the collapse, several federal agencies, including the Occupational Safety and Health Administration ("OSHA") and the National Transportation Safety Board ("NTSB") launched investigations into the cause of the collapse.

48.     Despite each review taking more than a year, neither agency performed testing on replicas of the key portions of the bridge.

49.     OSHA examined the matter because of the death and injury to workers on the FIU bridge worksite.

50.     In July 2019, OSHA issued a report summarizing its investigation into the cause of the collapse.  Figg was not allowed to participate in the drafting of the OSHA report, or review or comment on the OSHA report before it was finalized and there is no mechanism to comment or challenge the report.

51.     OSHA's investigation included interviews of individuals, a review of pertinent construction documents and structural computations, an examination of the failed portions of the bridge, a structural analysis and review of photographs taken before and following the accident.

52.     Based on this review, OSHA made eleven findings, including findings that:

   a.  The bridge had structural design deficiencies;

   b.  The cracks forming in the bridge warranted a closure of SW Eighth Street;

   c.  Figg, though not onsite, failed to recognize that the bridge was in danger of collapsing;

   d.  BPA, which served as the Construction Engineering Inspector and was onsite, failed to classify the cracks as structural in nature with the FDOT;

   e.  BPA also failed to recognize that the bridge was in danger of collapsing and did not recommend to FIU, MCM or others to close SW Eighth Street and shore the bridge;

   f.  MCM was aware that the cracks were getting larger and failed to immediately inform Figg's EOR; and

   g.  MCM failed to exercise its own independent judgment in implementing safety measures.

53.     In addition to issuing a report, OSHA issued citations for seven violations to five companies, totaling $86,658 in proposed penalties. The companies that received citations were MCM (two violations), BPA (one violation), Structural Technologies LLC (doing business as

Structural Technologies/VSL)(two violations), The Structural Group of South Florida Inc.(one violation), and Figg (one violation). The citation issued to Figg alleges that Figg exposed its employees to crushing and falling hazards. The citation imposes a fine of $12,934.00. Figg has not agreed to the finding and penalty and is contesting the citation.

**The FHWA's Assessment**

54. On October 19, 2018, the FHWA submitted a report to the NTSB concerning the horizontal concrete surface between the deck and Members 11 and 12 at the north end of the bridge. In this report, the FHWA examined the cold joint between the deck concrete pour and the truss member pour, and also assessed the roughness of the interface created at the cold joint.

55. The FHWA found that the failure interface coincided with the original cold joint and that the cold joint was not intentionally roughened. This is in contrast to the Florida Department of Transportation Standard Specifications for Construction that were applicable to the project which required that the joint be intentionally roughened.

56. On September 12, 2019, the FHWA submitted its Assessment of Bridge Design and Performance to the NTSB.

57. In this report, among other items, the FHWA claimed that the root cause of the collapse was a deficiency in the bridge's design, including an inability of the structure to resist interface shear demands in the critical nodal region at the north end of the bridge. The Agency also claimed that, in the days leading up to the accident, the structure behaved in a manner that provided warning of the failure, through the development of significant and visible distress that grew over time.

58.     The FHWA posted its submission as a surprise in the public docket at a time when no other party could comment prior to an NTSB board meeting.  This skirting of the process was not customary and lacks the transparency for which this process is generally and otherwise touted.

59.     On September 23, 2019, the FHWA submitted a new version of the previously released October 19, 2018 report to the NTSB concerning the horizontal concrete surface between the deck and Members 11 and 12.  The new version of the report concluded that "a portion of" the failure interface coincided with the original cold joint and that the cold joint was not intentionally roughened.

**Figg's Independent Investigation into the Cause of the FIU Pedestrian Bridge Collapse**

60.     As part of its process, the NTSB welcomed input from the various participating parties, including Figg.

61.     To assist in NTSB's investigative efforts and provide more thorough input, Figg retained Wiss, Janney, Elstner Associates, Inc. ("WJE"), a preeminent forensic structural engineering firm, to conduct an independent, forensic investigation of the accident.

62.     The scope of WJE's investigation included, among other things, an evaluation of the failure pattern, a structural analysis (including an evaluation of adherence to design code), an examination of the construction of joint conditions, and physical testing of interface shear and the deck connection.

63.     Among the many forensic tasks WJE performed in undertaking this independent investigation, WJE performed full-sized specimen tests.  In other words, WJE reconstructed aspects of the bridge, such as the concrete members, in the same manner as called for in the design plans and specifications and tested them against the same stresses.  Neither FHWA, OSHA nor NTSB investigations included tests or analysis of full-sized specimens.

64.    On September 18, 2019, WJE issued its independent report.  Contrary to the findings in the NTSB report, among WJE's various findings, it determined that:  a) considering the entire construction joint between Member 11/12 and the deck, the design as shown on the released for construction plans and specifications did meet the AASHTO code; and b) if the construction joint were roughened as required by the project specifications, which Figg reconfirmed by email to MCM, the collapse would not have occurred.

65.    Further, WJE found several failures in Louis Berger's peer review oversight. Specifically, Louis Berger admittedly failed to consider structural integrity during construction. Louis Berger's additional failures included the fact that: (1) its analytical model of the structure was incorrect and not appropriately conservative; (2) its file lacked typical peer review documents; and (3) notwithstanding its certification letters, its peer review fell far short of what was required per its contract with Figg.

66.    WJE also found that twisting of the span during the move exceeded the established limits to the structure and caused high stresses in the Member 11 and 12 deck connection area. This corresponds to the increased cracking in the connection region of Members 11 and 12 after the move on March 10, 2018.  Therefore, along with other factors, this stress may have contributed to damage in the region and ultimately to the collapse.

67.    Finally, WJE also found that, contrary to Figgs's instructions when implementing remedial measures to address the cracks, no party responsible for doing so closely monitored cracks in the north-end during the re-stressing of Member 11, even though both MCM and Structural/VSL, (post-tensioning subcontractors to MCM) were aware of Figg's instruction. Furthermore, Structural/VSL's shop drawings state that stressing operations should stop if existing

cracks widen or new cracks were observed, which should have been readily detected during the process.

68.     WJE's independent investigation concluded that Figg's design was to code, was not flawed, but was improperly executed, and Figg's guidance on the re-stressing of Member 11 was not followed.

69.     On September 20, 2019, Figg submitted WJE's findings to the NTSB as part of the NTSB's process of accepting information and input from participating parties.

### NTSB's Investigation and Report

70.     On May 23, 2018, the NTSB, an independent federal agency dedicated to promoting safety across all modes of transportation, issued a Preliminary Report that outlined the investigation that it would be performing.  The NTSB noted that Figg was among the parties assisting it in its investigation.

71.     However, NTSB did not follow its usual practices and processes for this sort of investigation and report.  For example, while NTSB allowed industry to provide comments, NTSB did not allow industry to observe or participate in the questioning of witnesses.

72.     From August to November 2018, the NTSB issued a series of preliminary investigative reports providing updates on its investigation and its initial findings and conclusions.

73.     In one such preliminary report, released November 15, 2018, the NTSB stated that it found design errors in load and resistance calculations pertaining to the portion of the bridge that ultimately failed – where truss members 11 and 12 connected to the bridge deck.  This finding from the NTSB's Preliminary Report mirrored what was contained in the final report and, as discussed in further detail below, would later form the basis of the FHWA's suspension and proposed debarment of Plaintiffs.

16

74.     Figg presented information to the NTSB and FHWA in a meeting on March 13, 2019 that demonstrated that if the Member 11 and 12 construction joint with the deck had been built in accordance with the Florida Department of Transportation Standard Specifications as required, the collapse would not have occurred. The presentation used a "Factor of Safety Approach" to support this conclusion. In response to Figg's March 2019 presentation and corresponding materials that were submitted, the NTSB requested the FHWA review the Figg materials and provide its thoughts to NTSB.

75.     The FHWA admittedly performed a "cursory review" of Figg's submission, FHWA claimed that it found two alleged deficiencies in Figg's factor of safety approach: a) the method employed by Figg included "unfactored representative values used that produce an unknown and unconservative level of reliability"; and b) the nominal capacity equation relied on the full strength of the materials used in the construction of the component and not some significantly lower working or allowable strength.

76.     The FHWA concluded that Figg's presentation only brought additional confusion to FHWA's understanding of the accident.

77.     FHWA's review of Figg's March 13, 2019 information was not provided to Figg until the NTSB public docket was opened on October 8, 2019. Notwithstanding FHWA's confusion, the NTSB did not request additional input from Figg and issued its final report on the accident on October 22, 2019.

78.     The NTSB explains at the outset of its report that "NTSB does not assign fault or blame for an accident or incident; rather, as specified by NTSB regulation, 'accident/incident investigations are fact-finding proceedings with no formal issues and no adverse parties… and are not conducted for purposes of determining the rights or liabilities of any person.'"

17

79.     The NTSB's investigation focused on the various issues, such as bridge design and construction, mechanisms of failure, the independent peer review of the bridge design, shortcomings in oversight and evaluation of the observed distress prior to the collapse, and the lack of redundancy guidelines in applicable specifications for pedestrian and concrete truss bridges.

80.     As a result of its investigation, the NTSB recommended new safety protocols for the FHWA, FDOT, AASHTO and Figg.

81.     The NTSB further stated that the probable cause of the collapse was the load and capacity calculation errors made by Figg in its design and contributing to the collapse was the inadequate peer review performed by Louis Berger.  The NTSB also explained that the severity of the outcome of the collapse was the failure of several parties, including MCM, Figg, BPA, FIU and the FDOT.  The NTSB further found that current design guidance for pedestrian and concrete truss bridges did not discuss redundancy.  The NTSB made eleven recommendations to the FHWA, FDOT, AASHTO and Figg to implement new safety measures for bridge projects in the future. Only two of the recommendations were for Figg and both have been acted upon.

### Figg's Efforts to Present the Results of WJE's Independent Investigation

82.     On November 13, 2019, Figg and WJE met with the FHWA for the first time to present Figg's and WJE's findings.  In this meeting,

   a.   WJE explained its conclusions that were contrary to the NTSB report, most notably that: a) considering the entire construction joint between Member 11/12 and the deck, the design as shown on the contract documents met the AASHTO code; and b) if the construction joint were roughened as required by the project specifications, which Figg reconfirmed by email to MCM, the collapse would not have occurred.

      b.   WJE also expressed its disagreement with a FHWA submission that was made to NTSB, which was only made public on October 8, 2019.

83.     With respect to the substance of the FHWA submission, WJE found an error in FHWA's horizontal shear calculations, and the exclusion of cohesion and reinforcement that contributes to capacity.

84.     When accounting for these excluded items, WJE found the calculation actually *satisfied* the AASHTO code.

85.     WJE also found that the FHWA failed to reconcile, or even calculate, load and resistance at the time of collapse.  Instead, the FHWA inappropriately labeled calculations as a root cause without considering design as reflected in the construction plans and specifications.

86.     Finally, WJE pointed out that the FHWA ignored WJE's full-size specimen tests, which no other investigative body – not OSHA, NTSB nor the FHWA – had gone through the effort to perform.

87.     In light of the disagreement between the FHWA and WJE, WJE and Figg requested an opportunity to meet again with FHWA representatives to discuss these technical points of disagreement.  In response, on November 14, 2019, D. Scott Wolf, the Special Assistant, Office of the Administrator of the FHWA, requested that the materials presented the day prior (on November 13, 2019) be provided to Joey Hartmann, FHWA Office of Bridges and Structures Director.

88.     On November 22, 2019, Linda Figg, President/CEO of the Company, provided the presentation slides from the November 13, 2019 meeting and WJE's supporting forensic analysis. In her email, Ms. Figg also explained that "it would be extremely helpful to facilitate the technical meeting if FHWA could provide relevant calculations and other supporting materials referenced

in the FHWA document 'Florida International University Pedestrian Bridge Collapse Investigation: Assessment of Bridge Design and Performance' dated September 12, 2019."

89.     Two weeks later, on December 6, 2019, Mr. Hartmann responded to Ms. Figg's November 22, 2019 email, recognizing his delay and providing a letter conveying his review and analysis of WJE's independent investigation.   Notwithstanding the fact that WJE's report completely rejected the findings of the NTSB and FHWA reports, Mr. Hartmann explained that he "found no new data or information from Figg/WJE that was not previously considered by [the FHWA] in advising and supporting NTSB as they conducted their analysis of the facts resulting in a determination of probable cause."   Among other things, this ignored the results and data derived from the full-size specimen tests.

90.     One week later, on December 13, 2019, Ms. Figg responded seeking a meeting.   As Ms. Figg explained, Figg and WJE took exception to Mr. Hartmann's conclusions set out in his December 6, 2019 letter and had hoped for a technical meeting.   Ms. Figg also pointed out that Mr. Hartmann's letter failed to provide insight into the misconceptions surrounding the FHWA's analysis.   Ms. Figg again reiterated the Company's desire for the FHWA's calculations, which the Agency was still withholding, and also detailed Figg's continuous efforts to have a technical discussion with FHWA since October to address these important topics.

91.     On December 17, 2019, Mr. Hartmann responded to Ms. Figg that, despite WJE's forensic analysis, "no uncertainty exists at NTSB nor FHWA" and that if she had undisclosed information, she should contact NTSB, as he (Mr. Hartmann) "did not see a need for another meeting [and they] consider[ed] the matter closed."

92.     Ms. Figg responded on December 23, 2019, expressing Figg's and WJE's strong disagreement and an opportunity to reconcile the investigative results.   Ms. Figg again reiterated

20

the importance for a technical meeting, which had yet to occur, and that Figg would be providing additional information in response to Mr. Hartmann's December 6, 2019 letter.

93.     On January 21, 2020, Figg and WJE responded to Mr. Hartmann's December 6, 2019 letter and December 17, 2019 email.  Figg's letter and the appended memorandum from WJE addressed Mr. Hartmann's issues point by point.  Figg again requested a technical meeting to further address the issues and provide clear answers for the industry.

94.     On January 23, 2020, Mr. Hartmann responded, again stating that he "found no new data or information in the material from Figg/WJE that was not previously considered by the [FHWA] in advising and supporting NTSB as it analyzed the facts and reached a determination of probable cause."  Mr. Hartmann continued, '[i]n this case, no uncertainty exists."  Mr. Hartmann made no reference to holding the technical meeting that Figg had been requesting for several months.

95.     On January 28, 2020, Figg responded to Mr. Hartmann's letter expressing its disappointment that "after requesting numerous times," FHWA would "not agree to have any technical meetings to professionally discuss the [WJE] forensic engineering investigation results and share technical back-up information from FHWA's investigation that has still not been disclosed."

96.     Neither Mr. Hartmann, nor any FHWA official, responded to Figg's January 28th letter.

97.     Figg received no further correspondence from the FHWA until it received a notice of suspension and proposed debarment on July 14, 2020.

98.     However, on June 1, 2020, Mr. Hartmann gave a webinar presentation at the virtual General Session for the 2020 Annual Meeting of the AASHTO Committee on Bridges and

Structures.  In this presentation, Mr. Hartmann discussed the FIU pedestrian bridge collapse and summarized many of the NTSB findings that "primarily identified 'the load and capacity calculation errors made by [Figg] in its design of the main span truss member 11/12 nodal region and connection to the bridge deck' as the probable cause of the accident."  Notwithstanding placing the primary blame on Figg, he admitted that only two of the NTSB recommendations related to Figg, whereas one recommendation involved FHWA, five related to FDOT and three to AASHTO.

### FHWA's Action to Suspend and Propose to Debar Figg and Mr. Pate

99.     On July 14, 2020, two and a half years after the accident, a year after the issuance of the OSHA report, nearly a year since FHWA provided its submission to NTSB, nearly 9 months after the issuance of the NTSB report, eight months since FHWA declared the investigation of the FIU bridge collapse "closed" by FHWA, nearly six months after Figg's last letter to FHWA seeking a technical meeting, which was ignored, and nearly two months after the FHWA's Director, Office of Bridges and Structures, publicly stated that the Agency believed Figg was the "probable cause" of the FIU pedestrian bridge collapse, the FHWA took the unprecedented step of suspending and proposing Figg and Mr. Pate for a debarment of ten (10) years.

100.     As outlined in the Memorandum of Suspension and Proposal to Debar, which supports the notices of suspension and proposal to debar Figg and Mr. Pate ("Notices"), the FHWA adopts and implements the Office of Management and Budget's Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement), commonly referred to as the Common Rule, at 2 C.F.R. Part 180.  2 C.F.R. 1200.10.  The Common Rule explains that given the seriousness of a suspension action, it may only be imposed when there exists "adequate evidence" to suspect an offense listed in 2 C.F.R. 180.800(a), or any other cause for debarment

under 2 C.F.R. 180.800(b) through (d), and "immediate action" is necessary to protect the public interest.  2 C.F.R. 180.700.

101.    Further, under the regulations, a person may be proposed for debarment when the agency can establish a cause for debarment under 2 C.F.R. 180.800 by a preponderance of the evidence.  2 C.F.R. 180.805(a) and 180.850(a).

102.    FHWA set forth two alleged grounds to support the suspension and proposed debarments of Plaintiffs:

> a.    Adequate evidence shows a willful failure to perform in accordance with the terms of one or more public agreements or transactions, as well as a willful violation of a statutory or regulatory provision or requirement applicable to a public agreement or transaction; and
>
> b.    Adequate evidence shows another cause so serious or compelling a nature that it affects a person's present responsibility.

103.    With respect to the first ground, the FHWA relied almost exclusively on the NTSB's finding that the probable cause of the construction accident was Figg and Mr. Pate; the NTSB report's assertion that Figg's bridge design violated Florida regulatory requirements; and that Mr. Pate's certification of the design, on Figg's behalf, similarly violated Florida regulations.

104.    With respect to the second ground, the FHWA again relied exclusively on the NTSB report and that the findings therein that the FHWA alleges how a lack of business integrity that seriously and directly affects Figg and Mr. Pate's present responsibility.

105.    To address the "immediate action" requirement of a suspension, however, FHWA simply provided that "[s]ince Figg and Mr. Pate *could work* on Government projects in the future,

I find *immediate action is necessary* to protect the public interest and preserve the integrity of future Government contracts." (emphasis added).

106.   In support of its bases for proposed debarment and immediate action, in its memorandum, FHWA cited to the NTSB report as supporting a conclusion that Figg acted in "reckless disregard for the safety of the traveling public" and that Figg and Mr. Pate were in "reckless disregard for providing safe design and construction processes [and] act[ed] in reckless disregard for the accuracy of the engineering design and recommendations as Engineer of Record on the public contract."

107.   However, the NTSB never arrived at the conclusion that Figg or Mr. Pate acted in reckless disregard.  In fact, the NTSB never uses "reckless" or "reckless disregard" in its report and explained at the outset of its report that "NTSB does not assign fault or blame for an accident or incident; rather, as specified by NTSB regulation, 'accident/incident investigations are fact-finding proceedings with no formal issues and no adverse parties . . . and are not conducted for purposes of determining the rights or liabilities of any person.'"

108.   To date, the FHWA has refused (despite counsel's request, as noted below) to afford Figg and Mr. Pate a fact-finding inquiry that would clarify technical aspects of disagreement between the NTSB and WJE investigations.

109.   In addition to implying that the NTSB found that Figg and Mr. Pate acted in reckless disregard, which it did not, the FHWA's memorandum also stated that Figg and Mr. Pate acted in "willful violation" of contract specifications and regulatory law.  Again, neither the NTSB nor OSHA reports made any such finding.   In fact, the administrative record reflects no investigative report making any such finding.

110.    To justify the proposed debarment of a ten (10) year debarment term, which is more than three times the traditionally-prescribed three (3) year term in the regulations (2 C.F.R. 180.865(a)), FHWA cited to a litany of alleged aggravating factors, which were only offset by two mitigating factors.

111.    The Notices provided that Figg and Mr. Pate had thirty (30) days from the date issued to respond with information and argument as to why they are presently responsible and such serious action is not necessary to protect the public interest.

112.    The timing of the FHWA Notices were curious as well and failed to reflect any actual exigency or immediate need.  Rather than issue the notices immediately following the release of the OSHA and/or NTSB reports, which they so heavily rely upon, the FHWA issued the notices nearly nine months later.  However, on July 20, 2020, just six days after issuing its Notices, the United States Department of Transportation's Office of Inspector General issued a letter to Congress acknowledging that, of the 41 firms involved in the FIU pedestrian bridge project, the FHWA suspended and proposed Figg and Mr. Pate for debarment.  Given the timing, the immediacy of the FHWA's action appeared more closely associated with congressional pressure, rather than the alleged findings of the OSHA and NTSB reports.

113.    In fact, the Notices were issued well after the FHWA had already awarded a contract to Figg by selecting its team for a project to perform a load rating of the Natchez Trace Parkway Arches, a signature bridge that Figg designed for the FHWA approximately 25 years ago. This contract was awarded in September of 2018 to Figg's team.  This is hardly the action of an agency concerned that Figg's participation would create an imminent risk to the public interest or public health or safety.

114.     In 2019, Figg was also retained on a federally-funded project for the Montana Department of Transportation to study a new highway alignment for Bad Rock Canyon.

**Figg and Mr. Pate's Response to the Notices of Suspension and Proposed Debarment**

115.     After retaining counsel, undersigned counsel for Plaintiffs contacted the FHWA point of contract, Ms. Lisa MacPhee, on July 24, 2020 to notify the agency that Venable represented Figg and Mr. Pate, to seek a copy of the administrative record, and to request a telephone call for a preliminary discussion regarding the matter.

116.     On July 28, 2020, counsel for Figg and Mr. Pate again contacted the FHWA reiterating its request for a preliminary telephone call to discuss the matter.

117.     On July 29, 2020, Ms. MacPhee offered several thirty-minute time slots on July 30 or August 3 for the preliminary telephone call.  Counsel for Figg and Mr. Pate accepted the first available time slot, 10 a.m. the next day (July 30, 2020).

118.     During the July 30, 2020 video conference call, counsel for Figg and Mr. Pate, among other topics, explained its concern regarding the legality of the suspension and requested that, at a minimum, a fact-finding inquiry be conducted.  Ms. MacPhee, who was joined by her colleague, Mr. David Sett, requested that any such concerns or requests be placed in writing for the agency's consideration.  Counsel for Figg explained it was clear that there was a genuine dispute over material facts and a fact-finding hearing was a necessity.  Ms. MacPhee stated that the information was "overwhelming" and that a formal request for such an inquiry would be required.  Given the FHWA's prior statements that the matter was closed and now that Ms. MacPhee felt the information warranting a suspension and proposed debarment was "overwhelming," it seems nonsensical to be required formally request a fact-finding inquiry from

the same individuals, when the agency has so clearly indicated its view that no information could change its view.

119.    On August 4, 2020, counsel for Figg and Mr. Pate submitted a letter to Ms. MacPhee and Mr. Sett explaining the concerns regarding the legality of the suspension, particularly as it related to the "immediate action" prong necessary to support a suspension.  The letter requested that, given the suspension's legal deficiencies and considering the harm being imposed upon Figg, the FHWA withdraw the suspension immediately or, at the latest, by Friday, August 7, 2020 close of business.

120.    In the early evening of August 5, 2020, after counsel for Plaintiffs inquired by email and telephone as to Ms. MacPhee's receipt of the August 4 letter, the FHWA explained that it may not be able to respond to Figg and Mr. Pate's request within the requested timeframe and that more time and information may be necessary.

121.    On August 7, 2020, the date by which Figg requested FHWA's response on the legality of the suspension, Figg offered several options to FHWA to resolve the matter short of litigation, while committing to an expedited debarment process to ensure that FHWA could protect the public interest.

122.    Despite counsel for Figg and Mr. Pate following up with the FHWA, as of the date of this filing, no further correspondence has been received from FHWA.

123.    Notably, and notwithstanding the fact that OSHA and NTSB found fault with the actions and conduct of other involved parties, such as FDOT, MCM, BPA and Louis Berger, as of the date of this filing, FHWA has taken no suspension or debarment action against these parties. In fact, when questioned on this point by counsel for Figg during its July 30, 2020 video conference

with Ms. MacPhee and Mr. Sett, Ms. MacPhee responded in the affirmative to counsel's comment that the FHWA was placing the entire blame of the construction accident on Figg and Mr. Pate.

**Imminent and Irreparable Harm to Plaintiffs on Account**
**of the Suspension and Proposed Debarment Notices**

124.    As a result of FHWA's Suspension and Proposed Debarments, Plaintiffs have and will suffer substantial and irreparable harm.

125.    Since July 14, 2020, Figg has been told that previously approved contract services are being put on hold, or that it is likely to lose existing contracts as a result of the FHWA suspension.

126.    Having learned of the FHWA's actions, the Harris County (Texas) Toll Road Authority ("HCTRA") has proposed to immediately terminate Figg's largest current contract which accounts for approximately 40% of Figg's current monthly revenue.  HCTRA has proposed that the termination be discussed at a Tuesday, August 9, 2020 meeting of the Commissioners Court of Harris County, Texas, the relevant governing body with authority to terminate the contract.

127.    Given the relative size of the HCTRA contract, termination of that contract alone will cause Figg irreparable harm because it will threaten the very existence of Figg's 42-year business.

128.    Additionally, Figg has lost current and future opportunities to bid on and participate in future contracts given its suspended status.

129.    Finally, Figg has suffered substantial reputational harm on account of FHWA's representations that it was the party solely responsible for the FIU bridge collapse, notwithstanding the substantial evidence to the contrary.

130.    Similarly, as a result of the suspension, Mr. Pate faces the loss of his career as an experienced and accomplished engineer.

## CLAIMS FOR RELIEF

### COUNT I: Violation of the Administrative Procedure Act

131.    Plaintiffs repeat and re-allege ¶¶ 1 through 130 as if set forth fully herein.

132.    The July 14, 2020 Suspension decisions against Plaintiffs Figg constitute final agency action.

133.    Pursuant to 2 C.F.R. 180.700, a suspending official may impose a suspension only when that official determines that there is:

    a.    An indictment for an offense listed under Section 180.800(a), or, adequate evidence to suspect any other cause for debarment listed under Section 180.800(b) through (d); and,

    b.    Immediate action is necessary to protect the public interest.

134.    By issuing the Notices and suspending Plaintiffs, the Agency failed to make a prima facie showing that its findings were supported by "adequate evidence" and that there existed an "immediate need" for such action in accordance with 2 C.F.R. 180.800 and 2 C.F.R. 180.700.

135.    By failing to point to any evidence of "immediate need," and ignoring all contrary indications that there *was* no immediate need, the Agency abused its discretion and further failed to follow its own regulations.  2 C.F.R. 180.705(c).

136.    The Agency action was arbitrary and capricious in that the Agency singled out Plaintiffs for suspension and proposed debarment on paltry evidence, despite the evidence reflecting the substantial involvement of other parties with responsibility for the FIU Bridge project and collapse.

137.    As a result, the Suspension Notices should be vacated under 5 U.S.C. §§ 701- 706.

## COUNT II: Claim for Injunctive Relief

138.   Plaintiffs repeat and re-allege ¶¶ 1 through 137 as if set forth fully herein.

139.   Plaintiffs will be irreparably harmed if the Suspensions remain in effect and are not vacated pending the conclusion of the debarment process.

140.   The harm to Plaintiffs far outweigh any harm to the FHWA, particularly given that the agency has failed to point to any specific, non-conclusory "immediate need" for suspending Plaintiffs.

141.   These concerns outweigh any public interest the FHWA has identified in issuing the Suspension Notices.

142.   Plaintiffs are therefore entitled to preliminary and permanent injunctive relief under 5 U.S.C. § 702.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an order and judgment:

1.   Declaring that the FHWA acted in violation of the APA in issuing its Suspension Notices to Plaintiffs;

2.   Vacating the Suspension Notices;

3.   Issuing a temporary restraining order, and preliminary and permanent injunctive relief prohibiting the FHWA from suspending Plaintiffs based on the current administrative record;

4.   Remanding the matter to the agency to continue the debarment process; and

5.   Granting such other and further relief as the Court deems just and proper.

Respectfully Submitted,

 /s/  Moxila A. Upadhyaya
Moxila A. Upadhyaya (D.C. Bar No. 494373)
Fred R. Wagner (D.C. Bar No. 416009)
Dismas N. Locaria (D.C. Bar No. 490096)*
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C.  20001
Tel: (202) 344-4000
Fax: (202) 344-4300
MAUpadhyaya@venable.com
FRWagner@venable.com
DLocaria@venable.com

*Counsel for Figg Bridge Engineers, Inc. and Mr. William Pate*

*\*pro hac vice motion forthcoming*