**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FIGG BRIDGE ENGINEERS, INC. & WILLIAM DENNEY PATE, <br>        Plaintiffs, <br><br> v. <br><br> FEDERAL HIGHWAY ADMINISTRATION and HARI KALLA, <br>        Defendants. | Civil Action No. 20-2188 (CKK) |

**MEMORANDUM OPINION**
(August 17, 2020)

Upon consideration of the briefing, the relevant authorities, and the record,[1] the Court

**DENIES** Plaintiffs' Motion for a Temporary Restraining Order ("Plaintiffs' Motion"), ECF No.

2.

## I.    BACKGROUND

This action arises out of the tragic collapse of the Florida International University ("FIU")

pedestrian bridge (referred to herein as the "FIU Bridge Collapse").  Compl. ¶¶ 2–3.  In 2016, "the

FIU Board of Trustees entered into a design-build contract with prime contractor, Munilla

Construction Management ("MCM"), to construct a pedestrian bridge that connected the

university campus in Miami, Florida, with the City of Sweetwater."  *Id.* ¶ 17.  Months later, MCM

entered into a subcontract with Plaintiff Figg Bridge Engineers, Inc. ("Figg") "to provide design

---

[1] The Court's consideration has focused on the following:
- Compl., ECF No. 1;
- Pls.' Mem. of Law in Supp. of Its Mot. for a Temp. Restraining & Preliminary Injunction ("Pls.' Mot."), ECF No. 2-1;
- Defs.' Opp'n to Pls.' Mot. for a Temp. Restraining & Injunction ("Defs.' Opp'n"), ECF 10;
- Administrative Record ("AR"), ECF Nos. 11-14; and
- Pls.' Reply in Supp. of Application for a Temp. Restraining Order & Preliminary Injunction ("Pl.'s Reply"), ECF No. 15.

and engineering services, including final design, construction drawings and specifications associated with the pedestrian bridge." *Id.* ¶ 18.  Plaintiff William Denney Pate, "an employee of Figg, served as the designated Engineer of Record" for the project.  *Id.*  Funding for the construction of the FIU pedestrian bridge came from multiple sources, including the U.S. Department of Transportation's Federal Highway Administration ("FHWA").  *Id.* ¶ 25; *see also* AR 30-31.

On March 15, 2018, while construction remained ongoing, the bridge collapsed.  Compl. ¶¶ 44–46.  Notably, substantial cracking was observed on the bridge in the days immediately preceding the collapse.  *Id.* ¶¶ 37–42; *see also* AR 141.  Mr. Pate and other Figg employees participated in remedial discussions regarding these cracks on the morning of March 15th, but the bridge collapsed just a few hours later.  Compl. ¶¶ 37–42.  Plaintiffs allege that the collapse was triggered by failed connections "between the Members 11 and 12 and the deck" of the bridge itself. *Id.* ¶ 45.  As a result of the FIU Bridge Collapse, six individuals died, and ten more were injured. *Id.* ¶ 46.

As would be expected, multiple investigations of the FIU Bridge Collapse ensued thereafter.  *Id.* ¶ 47.  On July 19, 2019, the Occupational Safety and Health Administration ("OSHA") issued a report summarizing its investigation of the collapse.  *Id.* ¶ 50; *see also* AR 3417–3551.  Among other findings, the OSHA report stated that "Figg, though not onsite, failed to recognize that the bridge was in danger of collapsing."  Compl. ¶ 52.  Additionally, the OSHA report found that "MCM was aware that the cracks were getting larger and failed to immediately inform Figg's EOR," Mr. Pate.  *Id.*

The National Transportation Safety Board ("NTSB") also conducted an investigation of the FIU Bridge Collapse.  *See* AR 1–157. The NTSB initiated its investigation on May 23, 2018, shortly after the collapse occurred.  Compl. ¶ 70.  During the investigative process, the NTSB

accepted external reports from both the FHWA, *see id.* ¶ 59, and Figg, *see id.* ¶ 69.  Figg's external

report, submitted to the NTSB, "concluded that Figg's design was to code, was not flawed, but

was improperly executed."  *Id.* ¶ 68.  The final NTSB report, however, which was released on

October 22, 2019, found that:

> [T]he probable cause of the Florida International University ("FIU") pedestrian bridge
> collapse was the load and capacity calculation errors made by Figg Bridge Engineers, Inc.
> in its design of the main span truss member 11/12 nodal region and the connection of the
> bridge deck. . . . Further contributing to the collapse was the failure of the Figg engineer of
> record to identify the significance of the structural cracking observed in this node before
> the collapse and to obtain an independent peer review of the remedial plan to address the
> cracking.

AR 22.  The NTSB report made two specific safety recommendations for Figg to implement in

future projects, both of which Figg has allegedly acted upon.  Compl. ¶ 81.

Following the NTSB report's release, Figg engaged in technical discussions with the

FHWA regarding the NTSB's assessment of the FIU Bridge Collapse.  *Id.* ¶¶ 82–96; *see also* AR

3713-3748.  The parties disagreed over the investigative results surrounding the event and

continued a correspondence addressing their disagreements through January 2020.  Compl. ¶¶ 82–

96; *see also* Defs.' Opp'n, Ex. A (Hartmann Decl.), ¶ 4.  The correspondence between Figg and

the FHWA, however, ended on January 28, 2020.  Compl. ¶ 96.  Months later, on July 14, 2020,

Plaintiffs Figg and Mr. Pate received notices of suspension and proposed debarment from the

FHWA.  *Id.* ¶ 97; *see also* Pls.' Mot., Exs. B–D.  The FHWA suspension and proposed debarment

determinations relied upon the NTSB report and its conclusion that Plaintiffs' actions were the

probable cause of the FIU Bridge Collapse.  *See id.*, Ex. D at 10–13.  The suspensions had the

immediate effect of precluding Plaintiffs from participation in future federal contracting.  *See id.*,

Ex. D at 1.

Following the July 14, 2020 notices, Plaintiffs engaged in preliminary discussions with the

FHWA regarding the suspension and debarment determinations.  Compl. ¶¶ 115–17.  On July 30,

2020, the parties participated in a conference call and specifically addressed the legality of the suspensions issued to Figg and Mr. Pate.  *Id.* ¶ 118.  The FHWA, however, stated that "overwhelming" evidence supported the need for these suspensions.  *Id.*  In response, Plaintiffs submitted a formal letter to the FHWA on August 4, 2020, requesting that the agency lift the suspensions immediately.  *Id.* ¶ 119.  But the agency did not respond to this request, and on August 10, 2020, Plaintiffs filed their complaint with this Court.  The next day, Plaintiffs filed a motion for injunctive relief, seeking a temporary restraining order "lifting Defendants' decision to suspend Plaintiffs from participating in any federally-funded government program and/or contract."  Pls.' Mot. at 2.

As of August 14, 2020, the parties have completed their briefing on Plaintiffs' Motion, and, pursuant to Local Rule 7(n) the FHWA has filed the appropriate administrative record with the Court.  The Court has also held a hearing regarding Plaintiffs' Motion.  Accordingly, Plaintiffs' Motion is now ripe for review.[2]

## II.    LEGAL STANDARD

A temporary restraining order ("TRO") is an extraordinary form of relief.  An application for a TRO is analyzed using factors applicable to preliminary injunctive relief.  *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011) (applying preliminary injunction standard to a district court decision denying motion for TRO and preliminary injunction); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary

---

[2] This Court has jurisdiction over Plaintiffs' APA claim.  *See* 5 U.S.C. § 704; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).  The FHWA suspensions now under review are final agency actions, which, upon their issuance, immediately curtailed Plaintiffs' participation in certain federal projects. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); 2 C.F.R. § 180.710 ("A suspension is effective when the suspending official signs the decision to suspend.").  Moreover, this is not the "rare circumstance" where there exists "no meaningful standard against which to judge the agency's exercise of discretion." *Make The Rd. New York v. Wolf*, 962 F.3d 612, 631 (D.C. Cir. 2020).  Finally, the government's decision not to contest this Court's jurisdiction reinforces the conclusion that jurisdiction is proper in this case.

injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (internal quotation marks omitted)). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis*, 571 F.3d at 1291. Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92.

It is unclear whether the United States Court of Appeals for the District of Columbia Circuit's ("D.C. Circuit") sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-

standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)).   However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis.  *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112.  In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success on the merits if the Court finds that its relative weight would affect the outcome.

## III.   DISCUSSION

Plaintiffs present overlapping, yet partially distinctive claims for injunctive relief. Accordingly, the Court will address each part of Plaintiffs' claims separately where appropriate. For the reasons provided herein, the Court will **DENY** both Figg's and Mr. Pate's application for a TRO.

### A.  Likelihood of Success on the Merits

The Court must first consider whether Plaintiffs have demonstrated a "substantial likelihood of succeeding on the merits." *Mills v. District of Columbia*, 571 F.3d 1304, 1306 (D.C. Cir. 2009).  "[T]o determine whether plaintiffs have demonstrated a likelihood of success . . . it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Monument Realty LLC v. Washington Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 76 (D.D.C. 2008) (quotation omitted).  A plaintiff's success on the merits is, of course, tied to the specific claim asserted, *see Mills*, 571 F.3d at 1308, and, accordingly, the Court will focus directly on Plaintiffs' APA claim regarding their FHWA suspensions.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law."  5 U.S.C. § 706(2)(A).  "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Moreover, the Court begins with a presumption that agency action is valid.  *See Ethyl Corp. v. Envtl. Prot. Agency*, 541 F.2d 1, 34 (D.C. Cir. 1976).  Nonetheless, courts must still consider whether an agency decision was appropriately "based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  Here, Plaintiffs argue that the FHWA's suspension determination under 2 C.F.R. § 180.700 was arbitrary and capricious.  *See* Compl. ¶ 136; Pls.' Mot. at 16–27.

Upon review of the record, the Court finds that Plaintiffs have not shown a substantial likelihood of success on the merits of their APA claim.  Under § 180.700, the FHWA may issue a suspension when (1) "[t]here exists adequate evidence to suspect [a] cause for debarment" and (2) "[i]mmediate action is necessary to protect the public interest."  2 C.F.R. § 180.700(a), (c).  As an initial matter, Plaintiffs' Motion does not raise a direct challenge to the "adequate evidence" prong of the § 180.700 analysis.  *See* Pls.' Mot. at 19, n.3.  And for good reason.  The record presents two agency reports, from OSHA and NTSB respectively, which attribute responsibility to Figg and Mr. Pate for the FIU Bridge Collapse.  Notably, the NTSB report, relied upon by the FHWA, expressly identifies Figg as the "probable cause" of the collapse, and further explains that Mr. Pate, as engineer of record, failed to recognize structural cracking on the bridge before it fell.  *See* AR 22.  These factual conclusions from the NTSB report are noteworthy, particularly when considering that the FIU Bridge Collapse is "the most serious safety case that FHWA has

7

considered in the last decade." Pls.' Mot., Ex. D at 19.  Accordingly, the Court concludes that the FHWA did not act "arbitrarily" in determining that "adequate evidence" existed to support a suspension prior to the potential debarment of either Figg or Mr. Pate.  *See* 2 C.F.R. § 180.700(b).

Plaintiffs' Motion instead focuses on the "immediate action" prong of § 180.700, and argues that the FHWA "fail[ed] to demonstrate the need for 'immediate action'" in its suspension determinations. Pls.' Mot. at 19, n.3.  The Court, however, disagrees with this conclusion.  Here, the FHWA supported its suspension assessment with a 23-page memorandum, explaining that "[s]ince FIGG and Mr. Pate could work on Government projects in the future, [the FHWA] find[s] immediate action is necessary to protect the public interest and preserve the integrity of future Government contracts."  *Id.*, Ex. D at 19.   While this language, in and of itself, leaves room for further explanation, *see Inchcape Shipping Servs. Holdings Ltd. v. United States*, No. 13-953 C, 2014 WL 12838793, at *2 (Fed. Cl. Jan. 2, 2014), Plaintiffs' decision to focus exclusively on this language divorces the agency's assessment from its overall context. *See* Pls.' Mot. at 20.  Indeed, the agency's evaluation of immediate need expressly incorporates the FHWA's detailed factual assessment of the FIU Bridge Collapse and the NTSB report, which identified several "failures by FIGG that contributed to the collapse of the bridge."   *Id.*, Ex. D at 10.  Such reasoning does not fall to the level of hollow agency rationale that this Court may overturn in its deferential review of agency action.  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.").

The inquiry, however, does not end there.  The FHWA's reliance on the NTSB report raises an interrelated question: Why did the FHWA wait until July 14, 2020 to issue the suspensions? Following the issuance of the report on October 22, 2019, the FHWA allowed Figg time to submit

supplemental materials, which contested the NTSB's conclusions.  *See* AR 3540 (November 22, 2019, Email from L. Figg).  The Court does not fault the agency for providing Figg with an opportunity to dispute the NTSB findings.  By December 6, 2019, however, the FWHA had rejected Figg's position and "closed" the case.  AR 3715–3721.  The agency then provided its final correspondence on the matter in a January 23rd letter from the FHWA Director of the Office of Bridges and Structures, Dr. Joseph Hartmann:

> I have found no new data or information in the material from FIGG/WJE that was not previously considered by the Federal Highway Administration (FHWA) in advising and supporting NTSB as it analyzed the facts and reached a determination of probable cause. . . . In this case, no uncertainty exists. The FHWA fully supports the findings and determinations of probable cause made by NTSB. The design errors by FIGG were the probable cause of the collapse of FIU pedestrian bridge, with the FIGG Engineer of Record contributing to the collapse by not appropriately recognizing the significance of the cracking that resulted from those errors.

AR 3745.  This record indicates that the FHWA had definitively accepted the NTSB report and its conclusions by January 2020.  Yet, the agency did not issue Plaintiffs' suspensions until July 14, 2020, over five months later.  This timing is of concern, as some courts have found that a "delay casts serious doubt on the government's claim that immediate action was necessary."  *Inchcape Shipping*, 2014 WL 12838793, at *2.

The Court cannot conclude here, however, that the FHWA's delay renders their finding of an immediate need to suspend Plaintiffs arbitrary and capricious.  As an initial matter, the FHWA expressly wields "wide discretion" when "deciding whether immediate action is needed to protect the public interest."  2 C.F.R. § 180.705(c).  Plaintiffs have not definitively established that the agency abused this "wide discretion" by waiting until July 14, 2020 to issue the suspensions in question.  Indeed, the FHWA explains that it needed time to "carefully review[ ] the voluminous information" in the record.  Defs.' Opp'n at 15.  While five months' time is not insignificant, the administrative record in this case comprises over 4,000 pages.  *See* ECF Nos. 11–14.  Moreover,

9

it is understandable that the FHWA would undertake careful deliberations before issuing a suspension, which Plaintiffs acknowledge "is a serious action" that is rarely imposed. 2 C.F.R. § 180.700. The length of the agency's review is also partially explained by the 90-day period provided by Department of Transportation guidance for fact-based investigations opened by the Office of Inspector General or the FHWA. *See* Defs.' Opp'n at 3 (citing USDOT Order 4200.5G at 9).

Furthermore, the FHWA's deliberative period here is distinguishable from the impermissible delays discussed in the cases Plaintiffs rely upon in their motion. In *Lion Raisins*, for example, the USDA waited over 18 months, following the close of its investigation into falsified certifications, before suspending the offending party from federal contracting. *Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238, 247 (2001). Similarly, in *Inchcape Shipping*, the United States Navy suspended a federal contractor for audit violations that were discovered over a year earlier. *Inchcape Shipping*, 2014 WL 12838793, at *2. The Federal Court of Claims found that both of these delays undermined the respective agency's demonstration of an immediate need for suspension. But here, the FHWA reached its suspension decision only nine months after the NTSB report was issued, and less than six months after it conclusively rejected Figg's response to the report contesting its conclusions. *See* Pls.' Mot. at 23. The FHWA's period of review in this case is, therefore, less dilatory than in *Lion Raisins* and *Inchcape Shipping*, particularly in light of the FHWA's administrative considerations noted above. Additionally, Plaintiffs have presented no evidence that Figg received any federal contracts *after* the FHWA accepted the findings of fault set forth in the NTSB report. *See* Pls.' Mot. at 24–25. This is distinct from a case like *Lion Raisins*, where the USDA "awarded plaintiff five contracts *between* the completion of its investigation in May 1999 and its decision to suspend plaintiff in January 2001." *Lion Raisins*, 51 Fed. Cl. at 247

(emphasis added).

Finally, it is not clear that the public safety threat posed by Plaintiffs "had ceased before the issuance of the suspensions." *Sloan v. Dep't of Hous. & Urban Dev.*, 231 F.3d 10, 17 (D.C. Cir. 2000). While the FIU Bridge Collapse itself occurred in 2018, the FHWA suspension memorandum directly references Figg's ongoing refusal to accept responsibility for the collapse after the release of the NTSB Report. Pls.' Mot., Ex. D at 14. In fact, the record shows that even into February 2020, Figg's CEO was arguing publicly that "misinformation" existed regarding the FIU Bridge Collapse. AR 4137. The Engineer of Record from the FIU project, Mr. Pate, also remains presently employed at Figg to this day. *See* Pls.' Mot., Ex. G (Pate Decl.), ¶ 4. Accordingly, it was reasonable for the FHWA to view Plaintiffs' continued participation in federal contracting as a public safety concern that had not yet abated. In this context the agency's July 14, 2020 suspensions do not fall clearly outside of its "wide discretion" in assessing the need for immediate action.

For the reasons set forth above, the Court finds that neither Plaintiff has established a substantial likelihood of success on the merits of their individual APA claim. *See Monument Realty*, 540 F. Supp. 2d at 76.

### B. Irreparable Harm

Next, the Court will consider the issue of irreparable harm. In the preliminary injunction and temporary restraining order context, both the United States Supreme Court and the D.C. Circuit have emphasized that a movant must show at least some likelihood of irreparable harm in the absence of an injunction. *See Winter*, 555 U.S. at 22; *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of

such imminence that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation omitted).  Because Figg and Mr. Pate present disparate claims of irreparable harm, the Court will address them individually.

### 1. Plaintiff Figg

Figg presents three potential sources of irreparable harm arising from the FHWA suspension: (1) economic damage, (2) reputational damage, and (3) damage *per se*.  *See* Pls.' Mot. at 27–32.  The Court concludes, however, that Figg has not made an adequate showing of irreparable harm on any of these grounds.

To begin, Figg's principal theory of irreparable harm derives from the economic loss it expects the FHWA suspension to cause.  *See* Pls.' Mot. at 28–32.  While "economic loss does not, in and of itself, constitute irreparable harm," *Alcresta Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 5 (D.C. Cir. 2018) (quoting *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985)), Figg contends here that the FHWA suspension threatens its very existence as a company.  *See Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997).  Relatedly, Figg argues that the FHWA suspension immediately deprives it of a fair opportunity to compete for business on a level playing field.  *See* Pls.' Mot. at 28–29.  Even accepting these arguments, however, Figg must still demonstrate that the economic harm it faces because of the FHWA suspension is "actual and not theoretical." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quotation omitted).  At this stage, Figg's purported economic damages are too speculative to satisfy this standard.

To show economic harm, Figg first points to three existing contracts, respectively with the Maine Department of Transportation (federally-funded), the Texas Harris County Toll Road Authority ("HCTRA") (state-funded), and the South Dakota Department of Transportation (state-

funded).  *See* Pls.' Mot. at 29–30.  The Court is not convinced, however, that these pre-existing

contracts demonstrate any concrete harm posed by the FHWA suspension.  As an initial matter,

counsel for the FHWA explained on the record that Figg's July 14, 2020 suspension does not affect

the company's existing federal contracts.  Neither is the FHWA suspension directed at Figg's state-

funded contracts.  *See* 2 C.F.R. § 180.125(b).  Accordingly, the formal nexus between the FHWA

suspension and Figg's pre-existing contractual arrangements, either state or federal, is unclear.

Moreover, even the informal effect of the FHWA suspension on Figg's contracts is

uncertain.  For example, as of August 11th, HCTRA had already terminated its contract with Figg.

*See* Pls.' Mot., Ex. A (Figg Decl.), ¶¶ 18–22; Defs.' Opp'n at 11.  And even if HCTRA were to

reconsider Figg's contract, the record shows that HCTRA has independent reasons to terminate

Figg, aside from the FHWA suspension in July 2020.  Notably, HCTRA was aware of concerns

with Figg's "design work on their project" as early as March 2020, and, before that, in November

2019, the Texas Department of Transportation had suspended Figg from a similar bridge project.

*See* Defs.' Opp'n, Ex. B (Budd Decl.), ¶¶ 6–10.  Consequently, there is no certainty that an order

lifting the FHWA suspension now will help Figg avoid the harm caused by the termination of the

HCTRA contract.  *See Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the United States*, 840

F. Supp. 2d 327, 338 (D.D.C. 2012) ("Plaintiffs have not established with any certainty that this is

a harm the Court could prevent with the issuance of a preliminary injunction.").

The two additional existing contracts Figg relies upon also fail to support a sufficiently

certain likelihood of harm.  Here, Figg complains of a temporary suspension of its contract with

the South Dakota Department of Transportation, but ascribes no monetary value to the damage

arising from this contract.  *See* Pls.' Mot. at 30.  In fact, counsel for Figg indicated that no work

had yet been performed on this contract, and the record confirms that this is a state-funded project

involving only a prospective retainer agreement.  *See* Defs.' Opp'n, Ex. C.  Figg also cites to a

contract with the Maine Department of Transportation.  *See* Pls.' Mot. at 30.  While this contract

has a total value of $800,000, Figg does not specify what immediate impact the FHWA suspension

would have on this contract or what effect the termination of that contract would have on the

company.  *See id.*  The Court cannot conclude, therefore, that complications with these contracts

present a clearly imminent threat to the company's viability.  *See Nat'l Ass'n of Mortg. Brokers v.*

*Bd. of Governors of Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 181 (D.D.C. 2011) ("[P]laintiff has

failed to adequately describe and quantify the level of harm its members face.").

Finally, Figg's purported inability to compete for future contracts also fails to present a

sufficiently concrete source of irreparable harm.  While Figg presents a list of potential federal

contracts it would like to consider, it also indicates that the company has neither participated in

the development of a bid nor submitted a bid for any of these projects.  *See* Pls.' Mot., Ex. A (Figg

Decl.), at Ex. A.  And there is no guarantee that Figg, particularly as a likely subcontractor, would,

in fact, participate or succeed in a bid for any given contract.  Accordingly, Figg's allegation of

prospective harm is more attenuated than that of a party with "active bids pending."  *Inchcape*

*Shipping*, 2014 WL 12838793, at *3.  Even if Figg did submit bids, however, the likelihood of

success is unclear, particularly in light of the October 2019 NTSB report, which publicly faulted

Figg for the FIU Bridge Collapse.  The removal of the FHWA suspension could not entirely erase

the industry stigma associated with this NTSB report, nor could it prevent that report from serving

as an impediment to securing prospective contracts.  For these reasons, Figg's economic theory of

harm is simply too speculative, as the company's "allegations of what is likely to occur" offer

inadequate assurances regarding what "harm is certain to occur in the near future."  *Wisc. Gas*,

758 F.2d at 674.

In addition to economic damage, Figg argues that the FHWA suspension immediately threatens irreparable harm to its reputation. *See* Pls.' Mot at 32–33. Reputational damage can, in certain circumstances, constitute a sufficient basis for irreparable harm. *See Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018). In the context of temporary injunctive relief here, however, the Court questions the nexus and "imminence" of the reputational damage specifically arising from the challenged FHWA suspension. *Mexichem Specialty*, 787 F.3d at 555. Notably, the FIU Bridge Collapse has been a well-publicized disaster since its occurrence in March 2018, and, as outlined above, the NTSB report in October 2019 ascribed responsibility for the collapse to Figg. In fact, Figg acknowledges that it was publicly identified as the probable cause of the disaster well before the July 14, 2020 FHWA suspension notice. *See* Pls.' Mot. 10–12. The fact the FIGG had "launched a public relations campaign denying responsibility for the accident" before the FHWA suspension confirms that the company was suffering reputational harm independent of the suspension itself. *Id.*, Ex. D at 14.

Consequently, Figg's case is distinguishable from cases in which the enjoined agency action is the principal source of the reputational harm in question. *See, e.g.*, *Beacon Assocs.*, 308 F. Supp. 3d at 288. Indeed, Figg's allegations of reputational harm lack a necessary element of causality. The D.C. Circuit has made clear that to secure temporary relief, the "movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wisc. Gas*, 758 F.2d at 674. Here, however, the FHWA suspension has only augmented a pre-existing reputational problem that Figg has encountered since at least the release of the NTSB report in October 2019. A TRO lifting the FHWA suspension might help Figg's cause, but the Court is not persuaded that it could unring the bell. As such, the reputational damage threatened by Figg's FHWA suspension cannot support a finding of irreparable harm.

15

Finally, Figg argues that any economic damage it sustains as a result of the FHWA suspension is irreparable *per se*.  *See* Pls.' Mot. at 28.  There is some support for this *per se* rule, particularly where an offending agency's sovereign immunity precludes the recovery of money damages that might result from the purported agency violation.  *See Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008).  This Court has rejected, however, the broad assertion that "any damages in a suit against a defendant with sovereign immunity are irreparable *per se*," because "not only is such a rule not the law of this Circuit, but it would also effectively eliminate the irreparable harm requirement."  *Air Transp. Ass'n*, 840 F. Supp. 2d at 335; *see also N. Air Cargo v. United States Postal Serv.*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010).  Instead, to establish irreparable harm, "the injury must be more than simply irretrievable, it must also be serious in terms of its effect on the plaintiff."  *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981).  And, for the reasons stated above, the Court cannot conclude that the specific effect of the FHWA suspension on Figg will be sufficiently severe to merit relief.  The purported effects of the FHWA suspension on Figg's economic status and its reputation are simply too speculative, particularly in light of the industry headwinds the company faces independent of the suspension itself.  *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 115 (D.D.C. 2015) (rejecting a *per se* theory of irreparable harm where "[t]he court [wa]s left to speculate as to the magnitude of the injury").  Accordingly, Figg's *per se* argument of irreparable harm falls short.

### 2.  Plaintiff Pate

The Court also finds that Mr. Pate has made an inadequate showing of irreparable harm to justify injunctive relief.  As discussed, irreparable harm must be "actual and not theoretical" and "of such imminence that there is a clear and present need for equitable relief."  *Mexichem Specialty*,

16

787 F.3d at 555.  Mr. Pate's theory of harm, however, is even more speculative than Figg's, and, therefore, cannot satisfy this standard.

Mr. Pate received an independent FHWA suspension notice on July 14, 2020.  *See* Pls.' Mot., Ex. C at 1.  Unlike Figg, however, Mr. Pate does not even attempt to tie the alleged harm arising from this suspension to his immediate financial viability or tangible contract prospects.  *See* disc. *supra*, at Section III.B.1.  Instead, Mr. Pate contends that this "suspension would 'completely end' his engineering career."  Pls.' Mot. at 32 (quoting Ex. G (Pate Decl.), ¶ 13).  But the factual record does not support this proposition.  Indeed, Mr. Pate certifies that he remains presently employed at Figg, *see id.*, Ex. G (Pate Decl.), ¶ 4, and provides no clear indication that Figg intends to terminate him as a result of the FHWA suspension.  This fact alone belies the conclusion that the FHWA suspension imminently threatens Mr. Pate's career.  *See id.* at 32.

To the contrary, Mr. Pate's career concerns relate to his longer-term industry prospects. For example, Mr. Pate explains that he possesses a highly specialized engineering skill-set, which would be largely inapplicable outside of the bridge-building context.  *See id.*, Ex. G (Pate Decl.), ¶¶ 5–9.  Mr. Pate further contends that he would be unmarketable in the industry as a bridge engineer barred from federally-funded projects.  *See id.*, Ex. G (Pate Decl.), ¶¶ 12–13.  This may be true, but such concerns are speculative in the near-term, while Mr. Pate remains employed with Figg.  *Id.*, Ex. G (Pate Decl.), ¶ 4.  And Mr. Pate's concern with his *potential* 10-year debarment is entirely speculative, as the FHWA has not yet rendered a final debarment determination.  *Id.*, Ex. G (Pate Decl.), ¶¶ 13–14.  Accordingly, Mr. Pate has failed to identify any specific and imminent form of harm derived from his FHWA suspension, the agency action now at issue. Without such a showing, he has failed to demonstrate the irreparable harm necessary to merit injunctive relief.  *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012).

### C.  The Balance of Hardships and the Public Interest

Lastly, the Court evaluates the final two factors to be considered in granting a temporary restraining order—the balance of the equities and the public interest.  In this case, where the FHWA is a government entity and party to the suit, the harm to the agency and the public interest "are one and the same, because the government's interest *is* the public interest."  *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).

Within this framework, the Court disagrees with Plaintiffs that the public interest weighs in favor of granting injunctive relief.  *See* Pls.' Mot. at 33–34.  Of course, Plaintiffs are correct that "[t]he public interest is served when administrative agencies comply with their obligations under the APA."  *N. Mariana Islands v. United States*, 686 F.Supp.2d 7, 21 (D.D.C. 2009); *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 246 (D.D.C. 2014).  But, as explained above, Plaintiffs have not demonstrated that the FHWA suspensions constituted a clear violation of that statute.  *See* disc. *supra* at Section III.A.  Moreover, Plaintiffs' Motion discounts the public safety interest at issue in this case.  *See* Pls.' Mot. at 33–34.  Here, both Figg and Mr. Pate have been found responsible for a fatal bridge collapse, and, consequently, there is a credible public safety interest reflected in their respective FHWA suspensions.  Finally, the Court notes that Mr. Pate has a uniquely weak case on the equities at this stage in the litigation, as he continues to be employed at Figg, notwithstanding the FHWA suspension.  *See* Pls.' Mot., Ex. G (Pate Decl.), ¶ 4.  For these reasons, neither Plaintiff has demonstrated that the FHWA suspensions are inequitable or against the public interest.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 2., is **DENIED**.  Plaintiffs have not demonstrated a likelihood of success on the merits, irreparable

harm absent preliminary relief, or that the balance of the hardships and the public interest weigh in their favor.  Accordingly, Plaintiffs are not entitled to the injunctive relief requested.

      An appropriate Order accompanies this Memorandum Opinion.


Date:  August 17, 2020

                  /s/
                COLLEEN KOLLAR-KOTELLY
                United States District Judge